Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
11/22/2017 08:11 PM CST

STATE OF NEBRASKA, APPELLEE, V. ETHAN BRAY, APPELLANT.

___ N.W.2d ___

Filed September 29, 2017.    No. S-16-874.

1.  **Constitutional Law: Search and Seizure: Motions to Suppress: Appeal and Error.** In reviewing a trial court's ruling on a motion to suppress based on a claimed violation of the Fourth Amendment, an appellate court applies a two-part standard of review. Regarding historical facts, an appellate court reviews the trial court's findings for clear error, but whether those facts trigger or violate Fourth Amendment protections is a question of law that an appellate court reviews independently of the trial court's determination.
2.  **Trial: Police Officers and Sheriffs: Search Warrants: Appeal and Error.** An appellate court reviews the trial court's findings of fact for clear error and gives deference to the inferences drawn from those facts by law enforcement officers, the court that issued the search warrants, and the trial court.
3.  **Constitutional Law: Search and Seizure: Evidence: Appeal and Error.** When the State seeks to submit evidence as sufficiently attenuated from a previous Fourth Amendment violation, an appellate court will review the trial court's findings of historical facts for clear error but review de novo the court's ultimate attenuation determination based on those facts.
4.  **Police Officers and Sheriffs: Search Warrants: Warrantless Searches.** A police officer who has obtained neither an arrest warrant nor a search warrant cannot make a nonconsensual and warrantless entry into a suspect's home in the absence of exigent circumstances.
5.  **Search and Seizure: Evidence.** The exclusionary rule prohibits the admission of physical and testimonial evidence gathered illegally.
6.  **Constitutional Law: Search and Seizure: Evidence.** One purpose of the exclusionary rule is to compel respect for the constitutional guaranty by removing the incentive to disregard it.
7.  **Search and Seizure: Evidence.** The exclusionary rule is applicable only where its deterrence benefits outweigh its substantial social costs.

8. **Evidence: Police Officers and Sheriffs.** Not all evidence is fruit of the poisonous tree simply because it would not have come to light but for the illegal action of the police; the question is whether the evidence has been obtained by exploiting the primary illegality or has instead been obtained by means sufficiently distinguishable so as to be purged of the primary taint.

9. **Constitutional Law: Search and Seizure: Evidence: Police Officers and Sheriffs.** Under the attenuation exception to the exclusionary rule, evidence is admissible when the connection between unconstitutional police conduct and the evidence is remote or has been interrupted by some intervening circumstance, so that the interest protected by the constitutional guarantee that has been violated would not be served by suppression of the evidence obtained.

10. **Constitutional Law: Search and Seizure: Evidence: Proof.** When the State asserts that evidence obtained in a search following a Fourth Amendment violation is admissible due to the defendant's consent to the search, it must prove two things: (1) The consent was voluntary, and (2) the consent was sufficiently attenuated from the violation to be purged of the primary taint.

11. **Search and Seizure: Evidence: Proof.** There is overlap between the voluntariness and the taint components that the State must prove, but they are not identical.

12. **Constitutional Law: Search and Seizure: Evidence.** A court must consider the evidence's admissibility in the light of the Fourth Amendment's distinct policies and interests, even if a consent to search is voluntary.

13. **Search and Seizure: Duress.** For consent to be voluntarily given, it must be a free and unconstrained choice, not the product of a will overborne, and it cannot be given as the result of duress or coercion, whether express, implied, physical, or psychological.

14. **Constitutional Law: Search and Seizure: Evidence: Time.** In determining whether the causal chain leading to consent is sufficiently attenuated from a Fourth Amendment violation to allow for the admission of the evidence, a court considers three relevant factors: (1) the time elapsed between the constitutional violation and the acquisition of the evidence (temporal proximity), (2) the presence of intervening circumstances, and (3) the purpose and flagrancy of the official misconduct.

15. **Search and Seizure: Police Officers and Sheriffs.** Being thoroughly advised by law enforcement of one's legal rights, including the right to refuse consent, is an intervening circumstance.

16. **Constitutional Law: Search and Seizure: Attorney and Client.** The opportunity for legal consultation is an intervening circumstance and has been considered under various circumstances critically important

in determining that consent was attenuated from a Fourth Amendment violation.

17. **Search and Seizure.** A suspect's knowledge of a prior illegal search can sometimes give rise to a sense that refusing to consent would be futile.

18. **Search and Seizure: Evidence: Police Officers and Sheriffs.** The purpose and flagrancy of the official misconduct is the most important attenuation factor.

19. **Search and Seizure: Evidence.** The underlying purpose of the attenuation exception is to mark the point of diminishing returns of the deterrence principle underlying the exclusionary rule.

20. **Search and Seizure: Evidence: Police Officers and Sheriffs.** If law enforcement did not likely foresee the challenged evidence as a probable product of their illegality, then it could not have been the motivating force behind it and the threat of exclusion could not possibly operate as a deterrent to such conduct.

21. **Search and Seizure: Police Officers and Sheriffs.** Purposeful and flagrant misconduct exists when (1) the impropriety of the official's misconduct was obvious or the official knew, at the time, that his or her conduct was likely unconstitutional but engaged in it nevertheless and (2) the misconduct was investigatory in design and purpose and executed in the hope that something might turn up.

22. ____: ____. Courts usually do not deem police misconduct as flagrant unless the illegal conduct was engaged in for the purpose of obtaining consent or the police misconduct was calculated to cause surprise or fear.

23. **Search and Seizure: Search Warrants: Police Officers and Sheriffs.** Officers can take reasonable measures to prevent occupants from becoming disruptive, dangerous, or otherwise frustrating the search; and such routine and preventative measures do not depend on the presence of a threat, actual or perceived, to the officers executing the warrant.

Appeal from the District Court for Nemaha County: Daniel E. Bryan, Jr., Judge. Affirmed.

Keith M. Kollasch, Nemaha County Public Defender, for appellant.

Douglas J. Peterson, Attorney General, and Austin N. Relph for appellee.

Heavican, C.J., Wright, Miller-Lerman, Cassel, Stacy, Kelch, and Funke, JJ.

Wright, J.

## I. NATURE OF CASE

While carrying out a search warrant for the common areas of a house and a roommate's bedroom, law enforcement observed through an open doorway drug paraphernalia in the defendant's bedroom. The district court overruled the defendant's motion to suppress evidence seized from his bedroom following the defendant's consent to a search. Because of the omission of the fact that the informant was in custody when he reported the illegal activities forming the basis for the warrant affidavit, the district court found the search warrant for the common areas was invalid. But the court found that the defendant's consultation over his cell phone with a person identified as his legal counsel, as well as law enforcement's advisement of the defendant's right to refuse consent, resulted in voluntary consent to the search that was sufficiently attenuated from the invalid warrant.

## II. BACKGROUND

Ethan Bray was charged under Neb. Rev. Stat. § 28-416 (Cum. Supp. 2014) with one count of possession of a controlled substance with intent to deliver, a Class III felony; three counts of possession of a controlled substance, which are Class IV felonies; and one count of possession of money used or intended to be used to facilitate a violation of § 28-416(1), a Class IV felony. Before trial, Bray moved to suppress all evidence gathered by law enforcement as a direct or indirect result of the entry and search of his residence on August 23, 2015. The entry of the residence was pursuant to a warrant directed toward one of his roommates, Alexander Gonsalves.

Bray asked for a hearing under *Franks v. Delaware*[1] to determine whether omissions in the warrant were made in reckless disregard for the truth and resulted in the warrant's being issued without probable cause. The district court found

---

[1] *Franks v. Delaware*, 438 U.S. 154, 98 S. Ct. 2674, 57 L. Ed. 2d 667 (1978).

the evidence sufficient to warrant a *Franks* hearing, and the following evidence was adduced.

### 1. Warrant

Officer Steven Bures prepared and signed the affidavit for the search warrant. The affidavit described that one of several roommates at Gonsalves' residence, Deven Moore, had reported that drug use and distribution were occurring in the home. Specifically, Moore reported to Bures that Gonsalves was involved in using marijuana. Moore told Bures that he had recently smelled marijuana in the house and had seen bongs and baggies. He had also taken baggies consistent with "dime bags" up to Gonsalves' room 2 to 3 weeks before. Finally, Moore had observed between 6 and 12 people visiting the house in the last 48 hours asking to see Gonsalves and going to Gonsalves' bedroom. Moore explained that he suspected the visitors were there to buy marijuana.

The parties stipulated that at the time Moore gave the information to Bures, he was in custody for driving under the influence. Additionally, Bures admitted on cross-examination that Moore had alcohol in his system when he gave Bures the information about Gonsalves' drug usage. Bures did not describe in the warrant affidavit either that Moore was in custody or that he was under the influence of alcohol when he informed Bures of Gonsalves' illegal activities.

Bures had been a law enforcement officer since 2012. He testified that he did not have any training or experience in preparing an affidavit based on information from an informant who is in custody. He did not know that it was important to specify in the affidavit that the informant was in custody. Bures believed at the time that the warrant was valid.

### 2. Observation of Bray's Room During Execution of Warrant

The warrant was to be served during the daylight hours and was to search for drugs and related items in the common areas of the house and in Gonsalves' bedroom. Officers Kaleb

Bruggeman, Matthew Kadavy, Jeff Timmerman, Harold Silvey, Dan White, and Bures conducted the search in the late afternoon of August 23, 2015.

While conducting the search, the officers observed Bray in his bedroom from the open doorway on the main level. They asked him to come out to the living room. Bray joined Gonsalves and another roommate on the couch in the living room. The roommates were monitored by Bruggeman and White while the remaining officers conducted the search of the common areas and Gonsalves' bedroom upstairs. None of the occupants who waited on the couch were patted down for weapons. They moved around the living room freely, but were asked to stay in that room.

While waiting for the other officers to conduct the search, Bray asked Bruggeman about the search warrant. Bruggeman explained the process of applying for a warrant and allowed Bray to examine it. Bruggeman described their tone as conversational. Bray understood that the warrant was not directed toward him.

Bray used his cell phone freely while in the living room. When it ran out of charge, he asked Bruggeman if he could retrieve a cell phone charger from his room. Bruggeman told Bray that he could, but that Bruggeman would have to accompany Bray into the room for the safety and security of everybody involved in the search warrant. Bray said that was fine. Bruggeman testified at the hearing that he wanted to ensure Bray did not obtain any weapons from the room and that accompanying Bray was standard protocol.

When Bruggeman accompanied Bray into the room, he observed a bong and a grinder with loose-leaf marijuana around it. Bruggeman also detected a strong odor of raw marijuana. Bruggeman did not make any statements at that time to Bray about what he observed, and Bray returned to the living room.

When Timmerman completed his part of the search, he waited in the living room while Bures completed some

paperwork. While doing so, Timmerman observed through the open doorway the bong in Bray's bedroom. He voiced this observation, and Bray responded that it was a vase. Bruggeman interjected that it was a bong.

About 45 minutes after the officers had arrived at the residence and begun their search, Bures joined the others in the living room. Bruggeman and Timmerman advised Bures that there was a bong, a grinder, and some marijuana in Bray's bedroom. From the living room, Bures looked into the room through the open doorway. He was able to observe these three items. He could also smell the odor of marijuana. Bures briefly walked into Bray's room but quickly left, without observing additional items.

### 3. CONSENT

Bures asked Bray if he could have a conversation with him out on the porch. Bray consented, and Timmerman and Silvey joined them. Bures stood nearest to Bray, while Timmerman and Silvey were farther away at other locations on the porch and did not directly engage in the conversation. Bures told Bray that he had seen drug paraphernalia and marijuana in Bray's bedroom. Bures asked Bray for consent to search his room, explaining that if Bray did not consent, he would apply for a search warrant. Bures described his tone as conversational.

Bray asked if he could call his legal counsel. Bures said he could, and Bray stepped away for a private conversation with someone on his cell phone. After that conversation, which lasted about 5 minutes, Bray said he would consent to the search. Bures retrieved a standard consent form from his vehicle. When Bures returned, he read the form to Bray. Bray also read the form on his own. The form advised Bray of his right to refuse to consent to a search.

Bray filled in his biographical information and then signed the consent form. Bray affirmed on the form that he was giving permission to search his room and vehicle freely and

voluntarily and that he had been informed of his right to refuse to permit the search.

After signing the form, Bray told the officers that he had over an ounce of marijuana in his room and wanted to show them other items in the room too. Bray "led the way" and showed them items in the room that were not particularly incriminating. Eventually, Bures informed Bray that they could conduct the search unassisted. The officers did so, though Bray continued to watch.

The officers seized a small amount of marijuana, the bong, and the grinder that were visible from the doorway. Several additional items that had not been plainly visible were found and seized during the search: two additional containers of marijuana, marijuana resin, two bottles of hashish oil, psilocybin mushrooms, a bottle of hydrocodone prescribed to Gonsalves, three loose amphetamine pills, a 100-gram weight, a digital scale, plastic wrap, small plastic bags, and $1,500 in cash. Bray was taken into custody, at which point he refused to make any statements and requested legal counsel.

### 4. Arguments Below

At the hearing on the motion to suppress, the county attorney acknowledged that the judge had said he would find the search warrant invalid if the informant who provided the information for the warrant affidavit was in custody when he provided the information. Therefore, the county attorney focused on arguing that Bray's consent to the search was sufficiently attenuated from any taint deriving from an illegal search warrant, such that suppression of the evidence was not warranted.

Defense counsel argued that the case law does not support the concept of voluntary consent to a search requested pursuant to observations while on the premises under an invalid warrant. Counsel argued that in such situations, there is never sufficient attenuation from the illegal warrant to purge the primary taint. Counsel further asserted that the Eighth Circuit and several other courts do not expand protective sweeps to

nonarrest situations and that there were no specific, articulable facts in this case indicating there were weapons in the house; thus, the initial entry into Bray's room was improper regardless of the warrant's validity.

## 5. Order on Motion to Suppress

### (a) Validity of Warrant

The district court agreed with Bray that the warrant was invalid. The court noted that the information in the affidavit in support of the warrant was based entirely on information from an informant. The court cited to *State v. Lammers*,[2] in which we said that the reliability of an informant may be established by showing in the affidavit that (1) the informant has given reliable information to police officers in the past, (2) the informant is a citizen informant, (3) the informant has made a statement that is against his or her penal interest, or (4) a police officer's independent investigation establishes the informant's reliability or the reliability of the information the informant has given.

The court noted there was no information in the affidavit indicating that Moore had given reliable information to police officers in the past, that Moore had made a statement against his penal interest, or that Bures had conducted an independent investigation establishing Moore's reliability or the reliability of the information Moore gave to Bures. Thus, Bures' affidavit to establish probable cause could rest only on whether Moore was a citizen informant.

The court concluded that Moore could not be considered a citizen informant, however, because he was under arrest and in custody when he gave Bures the information upon which the affidavit was based. The court reasoned that Moore's information was not self-corroborating under *State v. King*,[3] because he could not, while in custody, "voluntarily" come forward with information.

---

[2] *State v. Lammers*, 267 Neb. 679, 676 N.W.2d 716 (2004).

[3] *State v. King*, 207 Neb. 270, 298 N.W.2d 168 (1980).

The court concluded that Bures' omission of the fact that Moore was in custody was a reckless disregard for the truth or grossly negligent under *Franks*.[4] Furthermore, the court could not find the affidavit supported probable cause when considering the four corners of the affidavit if it had included the omission. Rather, the district court judge, who had also issued the warrant, stated "categorically" that if he would have known Moore was in custody, he would have required additional information to show reliability of Moore's assertions before finding probable cause for the warrant.

### (b) Good Faith

The court rejected any contention that Bures acted in good faith in reliance on the invalid warrant. The court reiterated that Bures was reckless. The court observed that Bures may not have had experience with affidavits for search warrants, but Bures was aware of his lack of experience and should have sought review of his affidavit by officers with more experience or by the county attorney before submitting the information to the court. The court concluded:

> It would be inexplicable to say that the officer acted in reckless disregard for the truth or grossly negligent in not providing important information to the Court to get his search warrant, yet acted in good faith by relying on his prepared affidavit for a search warrant that was issued with material information that he should have known was omitted.

### (c) Consent

The court ultimately concluded that Bray's voluntary consent purged the taint of the Fourth Amendment violation. It found the facts most similar to *U.S. v. Greer*,[5] wherein the Eighth Circuit held that the intervening circumstances of consulting with a brother and a written advisement of the right to

---

[4] *Franks v. Delaware, supra* note 1.

[5] *U.S. v. Greer*, 607 F.3d 559 (8th Cir. 2010).

refuse consent made the consent to search attenuated from the illegal entry, despite the fact that there was not a long lapse of time between the violation and the consent to search.

The district court noted the facts supporting attenuation of Bray's consent from the illegal entry into the home:

> Bray was not the subject of the original investigation. The search was intended to be only for another resident (Gonsalves). Bray was instructed he needed to stay in the common living area while the search was being conducted in Gonsalves's room and the common areas. The investigation was never intended to focus on Bray. Bray was aware of this because he asked and was given the warrant to read while in the common area before any of the events in regard to Bray unfolded. It was Bray's personal request to leave the common area and go into his room that triggered the events that lead [sic] to his consent to search his room and vehicle. Bray was told if he wanted to go into his room it would be with the company of an officer for security reasons. Bray was ok with that. This was not an attempt by the officer to exploit the search beyond the warrant. There was no pretext. It was Bray that willing [sic] and freely opened this door to expand this investigation. Also, . . . Bures took Bray aside after being told of the observations of the officers and told Bray about what was observed and requested consent to search. He did inform Bray that if he did not consent he would apply for a search warrant. Bray asked to consult with his attorney. Bray was given the opportunity by the officer to call his attorney. Bray made a call and consulted with someone after which he then verbally consented. The officer wanted Bray's consent in writing so he had him fill out and sign exhibit # 3. That form specifically tells Bray he had a right to decline the search and seizure of any property from his residence and vehicle. Bray signed it in any event.

The court balanced these facts of attenuation against the court's conclusion that Bures did not act in an intentionally

deceitful manner.[6] Considering the totality of the circumstances, the court found that the flagrancy of the official misconduct was not so serious that it tainted the consent given by Bray. In other words, the court found that the officer's procurement of Bray's consent to the search was not an exploitation of the illegality of the initial warrant. As such, the court overruled Bray's motion to suppress.

### 6. Conviction and Sentence

Following a stipulated bench trial, the court found Bray guilty of all charges. Bray was sentenced to 4 years of probation. Bray appeals.

### III. ASSIGNMENTS OF ERROR

Bray assigns that the district court erred in overruling his motion to suppress, because it erred in finding that his consent was voluntarily given and that the consent was sufficiently attenuated from the illegal search.

### IV. STANDARD OF REVIEW

[1] In reviewing a trial court's ruling on a motion to suppress, based on a claimed violation of the Fourth Amendment, an appellate court applies a two-part standard of review.[7] Regarding historical facts, an appellate court reviews the trial court's findings for clear error, but whether those facts trigger or violate Fourth Amendment protections is a question of law that an appellate court reviews independently of the trial court's determination.[8]

[2] We review the trial court's findings of fact for clear error, and we give deference to the inferences drawn from those facts by law enforcement officers, the court that issued the search warrants, and the trial court.[9]

---

[6] See *Brown v. Illinois*, 422 U.S. 590, 95 S. Ct. 2254, 45 L. Ed. 2d 416 (1975).

[7] *State v. Rogers, ante* p. 265, 899 N.W.2d 626 (2017).

[8] *Id.*

[9] *U.S. v. Reinholz*, 245 F.3d 765 (8th Cir. 2001).

[3] When the State seeks to submit evidence as sufficiently attenuated from a previous Fourth Amendment violation, we will review the trial court's findings of historical facts for clear error but review de novo the court's ultimate attenuation determination based on those facts.[10]

## V. ANALYSIS

[4] The U.S. Supreme Court has consistently held that the entry into a home to conduct a search or make an arrest is unreasonable under the Fourth Amendment unless done pursuant to a warrant.[11] A police officer who has obtained neither an arrest warrant nor a search warrant cannot make a nonconsensual and warrantless entry into a suspect's home in the absence of exigent circumstances.[12]

The district court found that Bray voluntarily consented to the search of his room and that his consent was sufficiently attenuated from the warrantless entry into the home to render the exclusionary rule inapplicable. We agree with the district court. And because we affirm on the ground that Bray's voluntary consent was attenuated from any illegality deriving from the warrant affidavit, we do not reassess the district court's determination that the omissions from the warrant affidavit were reckless and that the affidavit failed to support probable cause when supplanted with the omitted information.[13]

[5,6] The exclusionary rule prohibits the admission of physical and testimonial evidence gathered illegally.[14] One purpose of the exclusionary rule is to compel respect for the constitutional guaranty by removing the incentive to disregard it.[15]

---

[10] *State v. Gorup*, 279 Neb. 841, 782 N.W.2d 16 (2010).

[11] *State v. Eberly*, 271 Neb. 893, 716 N.W.2d 671 (2006).

[12] *Id.*

[13] See *U.S. v. Reinholz, supra* note 9.

[14] *Wong Sun v. United States*, 371 U.S. 471, 83 S. Ct. 407, 9 L. Ed. 2d 441 (1963).

[15] See *Elkins v. United States*, 364 U.S. 206, 80 S. Ct. 1437, 4 L. Ed. 2d 1669 (1960).

The exclusionary rule includes all evidence derivative of the illegality, referred to as the "fruit of the poisonous tree."[16]

[7,8] However, the exclusionary rule is applicable only where its deterrence benefits outweigh its substantial social costs.[17] Not all evidence is fruit of the poisonous tree simply because it would not have come to light but for the illegal action of the police.[18] The question is whether the evidence has been obtained by exploiting the primary illegality or has instead been obtained by means sufficiently distinguishable so as to be purged of the primary taint.[19]

[9] With this in mind, several exceptions to the exclusionary rule have been recognized.[20] Under the attenuation exception, evidence is admissible when "the connection between unconstitutional police conduct and the evidence is remote or has been interrupted by some intervening circumstance, so that 'the interest protected by the constitutional guarantee that has been violated would not be served by suppression of the evidence obtained.'"[21]

[10-12] When the State asserts that evidence obtained in a search following a Fourth Amendment violation is admissible due to the defendant's consent to the search, it must prove two things: (1) The consent was voluntary, and (2) the consent was sufficiently attenuated from the violation to be purged of the primary taint.[22] There is overlap between the voluntariness and the taint components that the State must prove, but they are

---

[16] See, *Utah v. Strieff*, ___ U.S. ___, 136 S. Ct. 2056, 195 L. Ed. 2d 400 (2016); *Elkins v. United States, supra* note 15.

[17] *Utah v. Strieff, supra* note 16.

[18] See, *Wong Sun v. United States, supra* note 14; *In re Interest of Ashley W.*, 284 Neb. 424, 821 N.W.2d 706 (2012).

[19] See *id.*

[20] See *Utah v. Strieff, supra* note 16.

[21] *Id.*, 136 S. Ct. at 2061.

[22] See, *In re Interest of Ashley W., supra* note 18; *State v. Gorup, supra* note 10.

not identical.[23] A court must consider the evidence's admissibility in the light of the Fourth Amendment's distinct policies and interests, even if a consent to search is voluntary.[24]

## 1. Voluntariness

[13] We agree with the district court that Bray's consent to the search of his room was voluntary. For consent to be voluntarily given, it must be a free and unconstrained choice, not the product of a will overborne, and it cannot be given as the result of duress or coercion, whether express, implied, physical, or psychological.[25] The determination of whether consent to search was freely and voluntarily given is based on the totality of the circumstances.[26]

Bray argues that he was under duress because he was detained by six officers for over 45 minutes and because the officers confronted him with the evidence they had observed in his room. But, to the contrary, the evidence shows that Bray was not in a particularly vulnerable subjective state.[27] The evidence indicates Bray was calm throughout the search of the home. While waiting for the search to be completed, Bray was allowed to move around the living room freely and use his cell phone. He was monitored, along with his two roommates, by only two officers. Bray was even allowed, with accompaniment, to enter his room to retrieve a cell phone charger. During the search of the common areas and Gonsalves' room, Bray asked Bruggeman questions about the legal process, which Bruggeman answered in some detail. Bray was allowed to examine the warrant. Bray was well aware that he was not the subject of the search being conducted.

---

[23] 4 Wayne R. LaFave, Search and Seizure, A Treatise on the Fourth Amendment § 8.2(d) (5th ed. 2012).

[24] See *id.* See, also, *State v. Gorup, supra* note 10.

[25] See *State v. Tyler*, 291 Neb. 920, 870 N.W.2d 119 (2015).

[26] *State v. Konfrst*, 251 Neb. 214, 556 N.W.2d 250 (1996).

[27] See *State v. Graham*, 241 Neb. 995, 492 N.W.2d 845 (1992) (account must be taken of possibly vulnerable subjective state of person who consents).

After the search of the house was complete, Bray agreed to speak with Bures out on the porch. Bray and Bures discussed whether Bray might consent to a search of his room. At all times, the tone between Bray and Bures was conversational. Bray was not physically restrained, and the officers who accompanied Bures on the porch kept their distance. When Bray made a call on his cell phone to discuss with his legal counsel the possibility of giving consent, he was given privacy.

Bray was not restrained while Bures left the porch to retrieve the consent form from his vehicle. Bray's thorough review of the consent form, discussions with Bures, and cell phone call to an outside advisor, resulted in clear knowledge of his right to withhold consent.[28]

While Bray was likely motivated to consent by Bures' statement that he would otherwise seek a search warrant, courts have never found statements by officers that they will seek a warrant to be coercive per se.[29] Bures did not deliberately give Bray false information in order to coerce Bray into consenting. And there is no evidence that Bures told Bray that a warrant would certainly be approved.

We can find no support under these facts for Bray's claim that his consent was involuntary because he was under duress. Rather, the State proved that it was the product of free and unconstrained choice.

## 2. ATTENUATION

[14] We also agree with the district court that Bray's consent was sufficiently attenuated from the Fourth Amendment violation such that the policies behind the exclusionary rule were not served by suppressing the evidence seized during the search. In determining whether the causal chain leading to consent is sufficiently attenuated from a Fourth Amendment violation to allow for the admission of the evidence, we

---

[28] See *State v. Konfrst, supra* note 26.

[29] See *State v. Tucker*, 262 Neb. 940, 636 N.W.2d 853 (2001).

consider three relevant factors: (1) the time elapsed between the constitutional violation and the acquisition of the evidence (temporal proximity), (2) the presence of intervening circumstances, and (3) the purpose and flagrancy of the official misconduct.[30] All relevant facts should be considered to determine whether, under all the circumstances presented, the consent was obtained by exploitation of the prior illegality.[31]

### (a) Temporal Proximity

Cases generally decline to find that the temporal proximity factor favors attenuation unless substantial time elapses between an unlawful act and when the evidence is obtained.[32] In this case, there was some adjournment after the illegal search was completed. After the illegal search and before Bray's consent, Bures conversed with other officers, Bray and Bures conversed on the back porch, Bray consulted with an outside advisor on his cell phone, Bures retrieved the consent form from his vehicle, Bures orally reviewed the form with Bray, and Bray carefully read it. Still, these events did not take a substantial period of time. We accordingly find that the temporal proximity factor weighs against attenuation. But temporal proximity is generally considered the least determinative factor involved in the attenuation analysis.[33]

### (b) Intervening Circumstances

[15] We find that intervening circumstances weigh in favor of attenuation. Being thoroughly advised by law enforcement of one's legal rights, including the right to refuse

---

[30] See, *Brown v. Illinois, supra* note 6; *In re Interest of Ashley W., supra* note 18; *State v. Gorup, supra* note 10.

[31] See, *In re Interest of Ashley W., supra* note 18; *State v. Gorup, supra* note 10.

[32] *Utah v. Strieff, supra* note 16.

[33] See, *People v. Lewis*, 975 P.2d 160 (Colo. 1999); 6 Wayne R. LaFave, Search and Seizure, A Treatise on the Fourth Amendment § 11.4(b) (5th ed. 2012).

consent, is an intervening circumstance.[34] As already dis-
cussed, Bray was carefully informed by Bures of his legal
right to refuse consent.

[16] The opportunity for legal consultation is likewise an
intervening circumstance and has been considered under vari-
ous circumstances critically important in determining that con-
sent was attenuated from a Fourth Amendment violation.[35]
Consulting with other advisors, such as family or friends, has
similarly weighed in favor of attenuation.[36] Before deciding
to consent to the search, Bray consulted over his cell phone
with a trusted advisor, in privacy and without any time limit
imposed by the officers. And there is no evidence contradicting
Bray's statement to the officers that he was consulting at that
time with his attorney.

While some courts reason that voluntary consent is not in
itself an intervening circumstance,[37] the facts here show that
Bray's consent was not merely voluntary in the sense that
his will was not overborne. Bray's thorough inquiries, the
advisements given, Bray's consultation with counsel, and his
calm demeanor suggest that his consent was sufficiently an
act of free will to be attenuated from the Fourth Amendment
violation.[38]

[17] We find no merit to Bray's argument that his consent
was an insufficient act of free will because he considered it

---

[34] See, *U.S. v. Perry*, 437 F.3d 782 (8th Cir. 2006); *U.S. v. Mendoza-Salgado*,
964 F.2d 993 (10th Cir. 1992); *U.S. v. Oguns*, 921 F.2d 442 (2d Cir. 1990);
*State v. Lane*, 726 N.W.2d 371 (Iowa 2007).

[35] See, *United States v. Wellins*, 654 F.2d 550 (9th Cir. 1981); 29 Am. Jur. 2d
*Evidence* § 651 (2008). See, also, e.g., *U.S. v. Fox*, 600 F.3d 1253 (10th
Cir. 2010); *State v. Weekes*, 268 N.W.2d 705 (Minn. 1978); *State v. Walsh*,
305 N.W.2d 687 (S.D. 1981).

[36] See, *U.S. v. Barone*, 721 F. Supp. 2d 261 (S.D.N.Y. 2010); *State v.
Huddleston*, 924 S.W.2d 666 (Tenn. 1996); *Wicker v. State*, 667 S.W.2d
137 (Tex. Crim. App. 1984).

[37] See, e.g., *U.S. v. Fox, supra* note 35.

[38] See, *Dunaway v. New York*, 442 U.S. 200, 99 S. Ct. 2248, 60 L. Ed. 2d 824
(1979); *U.S. v. Herrera-Gonzalez*, 474 F.3d 1105 (8th Cir. 2007).

futile to refuse consent once confronted with the items plainly visible in his room. It is true that a suspect's knowledge of a prior illegal search can sometimes give rise to a sense that refusing to consent would be futile.[39] "'[A] person might reasonably think that refusing to consent to a search of his home when he knows that the police have, in fact, already conducted a search of his home, would be a bit like closing the barn door after the horse is out.'"[40]

In this case, though, there were still several horses in the barn. The officers confronted Bray with a bong, a grinder, and a small amount of marijuana that were plainly visible. But Bray knew that the officers had not yet seen many other incriminating items hidden in his room: two additional containers of marijuana, marijuana resin, two bottles of hashish oil, psilocybin mushrooms, a bottle of hydrocodone prescribed to Gonsalves, three loose amphetamine pills, a 100-gram weight, a digital scale, plastic wrap, small plastic bags, and $1,500 in cash.

In light of this, it was not futile to close the barn door. Rather, Bray assessed the situation and determined he might benefit from trying to cooperate instead of running the risk that a search warrant for his room would be obtained. Indeed, his attempts to lead and supervise the search indicate Bray may have hoped to control the amount of incriminating evidence that would be uncovered. The fact that the search did not turn out as Bray may have hoped does not make his choice to consent less an act of free will. We find that intervening circumstances weigh in favor of attenuation.

### (c) Purpose and Flagrancy

[18-20] Lastly, we consider the purpose and flagrancy of the misconduct. The purpose and flagrancy of the official misconduct is the most important attenuation factor.[41]

---

[39] See *U.S. v. Washington*, 387 F.3d 1060 (9th Cir. 2004).

[40] *U.S. v. Haynes*, 301 F.3d 669, 683 (6th Cir. 2002).

[41] *U.S. v. Simpson*, 439 F.3d 490 (8th Cir. 2006).

This is because the underlying purpose of the attenuation exception is to mark the point of diminishing returns of the deterrence principle underlying the exclusionary rule.[42] If law enforcement did not likely foresee the challenged evidence as a probable product of their illegality, then it could not have been the motivating force behind it and the threat of exclusion could not possibly operate as a deterrent to such conduct.[43]

[21,22] Purposeful and flagrant misconduct exists when (1) the impropriety of the official's misconduct was obvious or the official knew, at the time, that his or her conduct was likely unconstitutional but engaged in it nevertheless and (2) the misconduct was investigatory in design and purpose and executed "'in the hope that something might turn up.'"[44] Courts usually do not deem police misconduct as "flagrant" unless the illegal conduct was engaged in for the purpose of obtaining consent or the police misconduct was calculated to cause surprise or fear.[45]

[23] The only misconduct in this case was Bures' reckless omission from the warrant affidavit. And it is undisputed that Bures did not actually know that the warrant affidavit suffered any infirmities. Although Bray complains that Bruggeman acted improperly when he accompanied Bray into his room to retrieve a cell phone charger, we disagree. It was proper for the officers to supervise and limit the movements of the house's occupants while conducting the search. Officers can take reasonable measures to prevent occupants from becoming disruptive, dangerous, or otherwise frustrating

---

[42] 6 LaFave, *supra* note 33, § 11.4(a). See, also, e.g., *Brown v. Illinois, supra* note 6; *U.S. v. Simpson, supra* note 41.

[43] See *id.*

[44] *U.S. v. Simpson, supra* note 41, 439 F.3d at 496 (quoting *Brown v. Illinois, supra* note 6).

[45] *Orosco v. State*, 394 S.W.3d 65 (Tex. App. 2012).

the search.[46] Such routine and preventative measures do not depend on the presence of a threat, actual or perceived, to the officers executing the warrant.[47]

There is no evidence that the illegal search of the home and Gonsalves' room had a collateral objective of obtaining consent to search additional bedrooms of the house. In other words, the purpose of the misconduct in omitting information from the warrant affidavit was not investigatory in the hope that "something might turn up." Further, the search was not conducted in a way calculated to cause surprise or fear. To the contrary, the officers were circumspect in carrying out the warrant that they believed to be valid. With limited exceptions, the officers did not cross the threshold into Bray's room until Bray's consent was given. They did not seize the items in plain view in Bray's room or search his room before obtaining his consent. And, as already discussed, such consent followed extensive legal advisements and Bray's outside consultation with counsel.

In sum, the officers' conduct in obtaining Bray's consent was neither a flagrant nor purposeful exploitation of the primary illegality. We accept for purposes of this opinion that Bures should have foreseen that the warrant was illegal, but neither he nor the other officers involved should have foreseen obtaining other occupants' consent to search their bedrooms as a probable product of the invalid search warrant. The invalid search warrant thus could not have been the motivating force

---

[46] See, *Bailey v. United States*, 568 U.S. 186, 133 S. Ct. 1031, 185 L. Ed. 2d 19 (2013); *Los Angeles County v. Rettele*, 550 U.S. 609, 127 S. Ct. 1989, 167 L. Ed. 2d 974 (2007); *Muehler v. Mena*, 544 U.S. 93, 125 S. Ct. 1465, 161 L. Ed. 2d 299 (2005); *Michigan v. Summers*, 452 U.S. 692, 101 S. Ct. 2587, 69 L. Ed. 2d 340 (1981). See, also, e.g., *U.S. v. Jennings*, 544 F.3d 815 (7th Cir. 2008); *Com. v. Hoffman*, 403 Pa. Super. 530, 589 A.2d 737 (1991).

[47] *Fields v. State*, 203 Md. App. 132, 36 A.3d 1026 (2012). See cases cited *supra* note 46. Compare *Dashiell v. State*, 374 Md. 85, 821 A.2d 372 (2003) (particularized suspicion required to frisk occupants).

behind asking Bray to consent to a search. Accordingly, the threat of exclusion could not possibly operate as a deterrent to the illegal conduct at issue in this case. We find that the last factor of the attenuation analysis weighs heavily in favor of attenuation.

Considering the three factors of temporal proximity, intervening circumstances, and the flagrancy and purpose of the official misconduct, we agree with the district court that the causal chain leading to Bray's consent was sufficiently attenuated from a Fourth Amendment violation to be purged of the primary taint.

## VI. CONCLUSION

The district court correctly determined that Bray's consent was voluntary and that it was not obtained by exploitation of the prior illegality of the search warrant. Therefore, the court properly admitted the evidence obtained during the search of Bray's room. Bray's assignment of error has no merit.

Affirmed.